UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

| | | |
|---|---|---|
| DR. EHAB SHEHATA, | ) | |
| | ) | |
| Plaintiff, | ) | Civil No. 3:20-cv-00012-GFVT-EBA |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| BLACKWELL, *et al.*, | ) | **&** |
| | ) | **ORDER** |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |

*** *** *** ***

This matter is before the Court upon cross-motions for summary judgment filed by

Plaintiff Dr. Ehab Shehata and Defendants University of Kentucky, Provost David W. Blackwell,

Dr. Larry Holloway, and General Counsel William E. Thro.  [R. 71; R. 107.]  Between January

2019 and June 2020, Dr. Ehab Shehata, an employee of the University of Kentucky College of

Dentistry accused of health care fraud, was forbidden from engaging in clinical activities and had

his employment contract terminated.  [R. 67 at 3-6.]  In response, Dr. Shehata filed suit against

multiple defendants including the University of Kentucky, Provost Blackwell, Dr. Holloway, and

General Counsel Thro.  [R. 1.]  In his Complaint, Dr. Shehata alleges violations of his procedural

and substantive due process rights, First Amendment retaliation, breach of contract, and

violations of Kentucky wage and hour law.  *Id.*  Dr. Shehata now moves for summary judgment

against Provost Blackwell for his procedural due process claim, against the University for his

breach of contract claim, and against multiple defendants[1] for his wage and hour claim.  [R. 71.]
In response, the University, Provost Blackwell, Dr. Holloway, and General Counsel Thro move
for summary judgment against Dr. Shehata for all claims filed against them.  [R. 107.]

Further relevant to this matter is a companion case, *Cunningham v. Blackwell*, *et al.*,
3:20-cv-00008-GFVT.  In that matter, Dr. Larry Cunningham, a former colleague of Dr. Shehata
who was also accused of having committed health care fraud, brings similar claims.  The Court
notes this companion case because the matters are closely intertwined and require frequent
reference to one another.  Specific to this matter, however, the Court, having reviewed the
record, and for the reasons set forth herein, will **GRANT IN PART** and **DENY IN PART** both
Motions [R. 71; R. 107.]

**I**

Dr. Ehab Shehata was employed at the College as both an oral and maxillofacial surgeon
and as a clinical title series assistant professor from 2013 through June of 2020.
[R. 71-4 at 1; R. 107 at 3.] In 2018, the office of the UK Healthcare Corporate Compliance began
an investigation of Dr. Shehata regarding a "documentation concern," which was later concluded
without disciplinary action.  [R. 71-4 at 12.]  In January 2019, however, William Blackwell, the
Provost of the University of Kentucky, informed Dr. Shehata that he was accused of fraud for
"claiming credit for services which he did not perform."  *Id.* at 21.  Though Provost Blackwell
allegedly indicated that "he was not comfortable pursuing termination at that time," he forbade
Dr. Shehata from performing any clinical activities.  *Id.* at 21-22.  As a result of this action, Dr.

---

[1] Although Dr. Shehata additionally moves for summary judgment against Defendant Stephanos
Kyrkanides for his Kentucky wage and hour law violations, the Court will analyze any claims
against Defendant Kyrkanides by subsequent order.  Accordingly, the analysis of this order is
limited to Dr. Shehata's claims against the University of Kentucky, Provost Blackwell, Dr.
Holloway, and General Counsel Thro.

Shehata was not allowed to treat patients in the faculty clinic, not allowed to perform surgery at UK Chandler Hospital, not allowed to oversee residents' and interns' patient care, not allowed to teach clinical courses, and forbidden from working at the Veterans' Administration Hospital. *See id.* at 23.  On June 24, 2019, in the midst of the ongoing investigation into his billing practices, Dr. Shehata signed his annual appointment and assignment contract, which he believed to guarantee him an additional two years of employment at the College.  [R. 71-4 at 29-30.]  In August 2019, however, Dr. Shehata was presented a letter through UK's counsel, William Thro, indicating that, only if he agreed to certain conditions, including an admission of wrongful conduct, would his contract be renewed.  *Id.*  Dr. Shehata did not agree to the terms included in the letter, and, as a result, was informed by Mr. Thro that his employment at UK would end on June 30, 2020.  *Id.* at 30.  On January 16, 2020, Dr. Shehata filed a Complaint alleging violations of his procedural and substantive due process rights, First Amendment retaliation, breach of contract, and violations of Kentucky wage and hour law.  [R. 1.]  Now, cross-motions for summary judgment are pending and ripe for review.

## II

The Court first turns to Plaintiff Dr. Shehata's Motion for Summary Judgment [R. 71-4.] In his Motion, Dr. Shehata seeks summary judgment against Provost Blackwell for his procedural due process claim, against the University for his breach of contract claim, and against multiple defendants for his wage and hour claim.[2]  [R. 71.]  Summary judgment is appropriate when the pleadings, discovery materials, and other documents in the record show "that there is

---

[2] Although the applicable defendants filed a short response to Dr. Shehata's Motion [R. 82], their arguments are briefed more fully in their own Motion for Summary Judgment [R. 107]. Consequently, the Court will examine the overlapping claims briefed in each Motion in this portion of its Order and will then proceed to analyze the claims solely briefed by Defendants in turn.

no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-25 (1986). "A genuine dispute exists on a material fact, and thus summary judgment is improper, if the evidence shows 'that a reasonable jury could return a verdict for the nonmoving party.'" *Olinger v. Corp. of the Pres. of the Church*, 521 F. Supp. 2d 577, 582 (E.D. Ky. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). The moving party has the initial burden of demonstrating the basis for its motion and identifying those parts of the record that establish the absence of a genuine issue of material fact. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). The movant may satisfy its burden by showing "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp.*, 477 U.S. at 325. Once the movant has satisfied this burden, the non-moving party must go beyond the pleadings and come forward with specific facts demonstrating there is a genuine issue in dispute. *Hall Holding*, 285 F.3d at 424 (citing *Celotex Corp.*, 477 U.S. at 324).

The Court must then determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Booker v. Brown & Williamson Tobacco Co*., 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson*, 477 U.S. at 251-52). In doing so, the Court must review the facts and draw all reasonable inferences in favor of the non-moving party. *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001). Summary judgment is inappropriate where there is a genuine conflict "in the evidence, with affirmative support on both sides, and where the question is which witness to believe." *Dawson v. Dorman*, 528 F. App'x 450, 452 (6th Cir. 2013).

## A

Dr. Shehata first seeks summary judgment against Provost Blackwell regarding his procedural due process claim. [R. 71-4 at 34-40.] In his Motion, Dr. Shehata alleges that Defendants forbade him to perform his clinical duties and terminated his employment without due process. *See id.* In opposition, Defendants seek summary judgment in their favor, arguing that Dr. Shehata held no property interest in his clinical duties, held only a limited interest in his employment, and that he was provided sufficient due process.[3] [R. 107 at 24-32.] The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides that "No State shall deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. The procedural component of the Due Process Clause protects rights created by state law and guarantees that no significant deprivation of life, liberty or property will take place until notice has been provided and the individual has a meaningful opportunity to be heard. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985). In *Kentucky Department of Corrections v. Thompson*, 490 U.S. 454, 109 S. Ct. 1904, 104 L. Ed. 2d 506 (1989), the United States Supreme Court stated:

> We examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State, *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 571, 92 S. Ct. 2701, 2706, 33 L.Ed.2d 548 (1972); the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient, *Hewitt v. Helms*, 459 U.S. at 472, 103 S.Ct. at 871, 74 L. Ed. 2d 675. The types of interests that constitute "liberty" and "property" for Fourteenth Amendment purposes are not unlimited; the interest must rise to more than "an abstract need or desire," *Board of Regents v. Roth*, 408 U.S. at 577, 92 S. Ct. at 2709, and must be based on more

---

[3] Defendants also argue that Dr. Shehata's procedural due process rights were not violated by the University permitting a third-party to determine whether a physician should receive a portion of the income derived from treating a patient or whether the University itself should receive the full payment. [R. 107 at 24-26.] However, Dr. Shehata clarifies in his Response that he has not made this claim, and instead, only claims that the stripping of his clinical duties and contract non-renewal occurred without procedural due process. [R. 109 at 18.]

than "a unilateral hope," *Connecticut Board of Pardons v. Dumschat*, 452 U.S. 458, 465, 101 S.Ct. 2460, 2464, 69 L.Ed.2d 158 (1981). Rather, an individual claiming a protected interest must have a legitimate claim of entitlement to it.

*Thompson*, 490 U.S. at 460.

Under step one, the Court must determine whether Dr. Shehata held a property interest which implicates procedural due process rights. [R. 71-4 at 32-36.] First, the Court will determine whether Dr. Shehata held a property interest in his ability to perform clinical duties. The College operates under the University's Dental Service Plan. [R. 71-4 at 2.] Under the Plan, the primary physician who performs services for a patient, called the "Treating Provider," is the physician who receives payment for his or her services. [*See id.* at 5.] If the Treating Provider is a faculty member like Dr. Shehata, the faculty member receives forty to sixty percent of the payment collected for the service provided, on top of his or her standard salary. However, if the Treating Provider is a resident supervised by a faculty member, the College itself receives the payment in its entirety.[4] *See id.* Accordingly, as a physician permitted to perform clinical services at multiple clinics owned by the University, Dr. Shehata was allowed to earn additional income on top of his standard salary for performing services for patients.

Dr. Shehata cites to Sixth Circuit and Supreme Court case law in support of his contention that he held a property interest in his ability to perform clinical duties and to collect additional income at his place of employment. [R. 71-4 at 34-36.] In *Singfield v. Akron Metro. Hous. Auth.*, for example, the Sixth Circuit indicated that a "property interest can be created by a state statute, a formal contract, or a contract implied from the circumstances." 389 F.3d 555, 565

---

[4] The basis of the accusation of fraud in this matter is that Dr. Shehata altered various patient notes to make it appear that he was the Treating Provider and thus entitled to payment when, in fact, a resident was the Treating Provider. Dr. Shehata disputes this accusation and states that he was indeed the Treating Provider in the scenarios alleged to be fraudulent by the University.

(6th Cir. 2004).  Moreover, in *Perry v. Sindermann*, the Supreme Court ruled that "[a] person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit."  408 U.S. 593, 601 (1972).  Under these theories, Dr. Shehata argues that, because he and the University had either an implied contract or "mutually explicit understanding" that a clinical professor would be permitted to perform clinical duties, and, in exchange, would have the opportunity to receive an additional economic benefit, he held a property interest in his clinical duties.  [*See* R. 71-4 at 34-36.]

In opposition, Defendants argue that Dr. Shehata did not hold a property interest in performing clinical duties.  Unlike Dr. Shehata, who characterizes his alleged property right as a form of economic interest implied by contract or mutual understanding, Defendants characterize his clinical duties as simply a job duty that the University was free to reassign without providing due process.  [R. 107 at 27-28.]  In support, Defendants cite to *Crosby v. University of Kentucky* and *Heavin v. Yates*.  *Id.*  In *Crosby*, the Sixth Circuit held that a faculty member's appointment as a department chair was not a protected property interest.  863 F.3d 845, 552-53 (6th Cir. 2017).  The plaintiff in *Crosby* pointed to several regulations governing administrative and faculty appointments as evidence that he and the University held a mutually explicit understanding that a department chair held a property interest in his chairmanship.  The Sixth Circuit rejected this argument, however, because the plaintiff could point to no regulation or contract which guaranteed him due process prior to removal.  *See id.* at 554-55.  Similarly, in *Heavin*, this Court found that, although the plaintiff had a protected property interest in her employment, she had no protected interest in the specific duties her job permitted her to engage in.  2021 U.S. Dist. LEXIS 19557 at *10-*11 (E.D. Ky. Feb. 2, 2021) ("No constitutional right to

teach a specific class or at a specific university exists").  Using support from the holdings of these cases, Defendants assert that Dr. Shehata's clinical duties were job duties subject to the discretion of his employer and that he therefore held no property interest in his duties.

The Court agrees with Dr. Shehata.  Here, unlike in *Crosby*, Dr. Shehata does point to a document which indicates the presence of a mutually explicit understanding: the Dental Service Plan.  In the DSP, the College expressly indicates that when there is a "restriction to the clinical services an individual may perform," an appeal and hearing process is triggered.  [R. 71-5 at 7.] Moreover, Dr. Shehata's employment offer letter, renewed every year through 2019, expressly indicates that he is "eligible to participate in the College's Dental Services Plan (DSP) which allows faculty members to receive income in patient care activities in College of Dentistry clinics or hospital operating rooms."  [R. 107-36 at 2.]  Consequently, unlike the documents in *Crosby*, the Plan guidelines and Dr. Shehata's employment offer letter indicate that a faculty member is eligible to participate in clinical activities and that, before this eligibility is removed or altered, the member is guaranteed due process.  [*See id.*; R. 71-5 at 7.]  Moreover, unlike in *Heavin*, Dr. Shehata's ability to perform clinical duties included an economic incentive which made up a large portion of his income, not simply a duty or specific preference he held at his place of employment.  Accordingly, based on the mutual understanding of Dr. Shehata and the University, the Court finds that the Dr. Shehata held a property interest in his clinical duties.

Alongside his clinical duties, Dr. Shehata argues that he held a property interest in his employment.  It is well settled that "[s]tate employees who have a property interest in their employment are entitled to certain minimum process before being fired."  *Cox v. Shelby State Community College*, 48 F. App'x 500, 507 (6th Cir. 2012) (citing *Cleveland Bd. Of Educ. v. Loudermill*, 470 U.S. 532, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985)).  A "property interest can

be created by a state statute, a formal contract, or a contract implied from the circumstances." *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 565 (6th Cir. 2004) (citations omitted). The Supreme Court has held that "college professors and staff members dismissed during the terms of their contracts have interests in continued employment that are safeguarded by due process." *Bd. Of Regents of State Colleges v. Roth*, 408 U.S. 564, 576-77, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972) (citing *Wieman v. Updegraff*, 344 U.S. 183, 73 S. Ct. 215, 97 L. Ed. 216 (1952)).

While neither party disputes that Dr. Shehata held a property interest in his employment, the parties disagree as to the period of time in which his property interest extended. On July 1, 2019, despite being under investigation for allegedly committing fraud, Dr. Shehata was "reappointed to his position as a clinical title series Assistant Professor." [R. 71-4 at 29.] Interim Dean Holloway and Dr. Raybould, the Chair of Dr. Shehata's department, approved and signed Dr. Shehata's reappointment, which indicated that he would be employed at the University through June 30, 2020. [R. 107 at 19.] Although, in response, Defendants argue that this reappointment was placed on hold while the fraud investigation was ongoing, they nonetheless concede that Dr. Shehata held a property interest in his employment through June 2020. [*See* R. 107 at 19.]

Dr. Shehata further argues, however, that his property interest did not expire in June 2020 but extended through June 2021. In explanation, Dr. Shehata points to UK Governing Regulation X, which governs the dismissal of non-tenured faculty members. [R. 109 at 23-24.] Regulation X states that "[n]otification of non-renewal of appointment after more than two (2) years of service shall be given at least twelve (12) months before expiration of appointment." [R 109 at 24.] Because Dr. Shehata alleges that he was not given notice of the non-renewal of his

9

contract twelve months prior to June 2020, he argues that he gained a property interest in an additional year of employment, to last through June 2021.[5]  [*See id.* at 25.]  In support, Dr. Shehata points to the depositions of Dr. Raybould and Provost Blackwell, who both indicated that, without having been given proper notice under Regulation X, Dr. Shehata should have been allowed to stay employed at the University beyond June 2020.  *Id.* at 24-25.  Upon review, it is evident that Dr. Shehata held a property interest in his employment through June 2020.  However, because it is unclear at this stage of the constitutional analysis whether an implied contract was created to extend Dr. Shehata's property right to his employment through June 2021, the Court turns to the second *Thompson* prong.

Secondly, the Court must determine "whether the procedures attendant upon that deprivation were constitutionally sufficient."  *Thompson*, 490 U.S. at 460 (citing *Hewitt v. Helms*, 459 U.S. at 472, 103 S.Ct. at 871, 74 L. Ed. 2d 675)).  "An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'"  *Loudermill*, 470 U.S. 532 at 542, 105 S. Ct. 1487, 84 L.Ed. 2d 494 (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313, 70 S. Ct. 652, 94 L.Ed. 865 (1950)).  In the employment context, "the Supreme Court has explained that 'the root requirement of the Due Process [C]lause is 'that an individual be given the opportunity for a hearing *before* he is deprived of any significant property interest."  *Mitchell v. Fankhauser*, 375 F.3d 477, 480 (6th Cir. 2004) (quoting *Loudermill*, 470 U.S. at 541).

However, due process rights are not without limits. A "university may dismiss a nontenured professor for any reason, or no reason, and the professor has no recourse unless such

---

[5] Although Dr. Shehata does not expressly state as such, the Court surmises Dr. Shehata to argue that the failure to provide timely notice in line with Regulation X created an implied contract which ensured him employment through another term.  [*See* R. 109 at 24.]

dismissal abridges his exercise of a constitutionally protected right." *Parate v. Isibor*, 868 F.2d 821, 827 (6th Cir. 1989) (citing *Perry v. Sinderman*, 408 U.S. 593, 592 (1972)).   Because of this, federal courts are reticent to "interfere in the internal operations of the academy." *Id.* (citing *Epperson v. Arkansas*, 393 U.S. 97, 104, 89 S. Ct. 266, 21 L. Ed. 2d 228 (1968)). Moreover, a university's failure to follow its own internal procedures does not give rise to a constitutionally protected property interest.  *See Doe v. Miami Univ.*, 882 F.3d 579, 603 (6th Cir. 2018) (stating that "a mere failure by the University to follow its own internal guidelines does not give rise to a procedural-due-process violation"); *see also Doe v. Cummins*, 662 F. App'x 437, 445 n.2 (6th Cir. 2016) (noting that the Constitution and "not internal school rules or policies" mandate what due process is constitutionally required following an alleged deprivation of a property interest).

Dr. Shehata argues that the process, or lack thereof, that he was provided prior to the removal of his clinical duties and non-renewal of his contract were constitutionally insufficient. [R. 71-4 at 36-40.]  First, Dr. Shehata alleges that he was provided no process whatsoever before he "was told that he could not perform any clinical services or have any patient contact." *Id.*  at 37.  Dr. Shehata, however, also appears to concede that he was "notified" of the charges against him and allowed an opportunity to explain his side of the story during the January 2019 meeting with Provost Blackwell.  [*See* R. 71-4 at 21.]  Nonetheless, Dr. Shehata argues that this meeting did not serve as a proper "hearing" because he was not provided an explanation of the University's evidence during this meeting.  [R. 109 at 26 (citing *Lane v. City of Pickerington*, 588 F. App'x 456 (6th Cir. 2014) (finding that a pre-deprivation hearing must include an explanation of the employer's evidence).  Accordingly, because "the fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner,"

Dr. Shehata asserts that his procedural due process rights were violated. *Id.* at 39 (citing *Loudermill*, 470 U.S. at 546.)

In response, Defendants assert that Dr. Shehata's clinical duties were never "revoked," as to require formal process. Instead, Defendants state that Dr. Shehata's job duties were simply "reassigned" to no longer include clinical duties. [R. 107 at 28-29.] Defendants argue that, because the University's Credentialing Committee would have had to have approved the revocation of Dr. Shehata's duties, which did not occur, Dr. Shehata's duties were not actually revoked. *See id.* at 29. Defendants also cite Dr. Shehata's own statements that his duties were not revoked in support of its position. *See id.* Regarding the lack of a formal hearing, Defendants argue that "Dr. Shehata had months of back-and-forth negotiation […] including his opportunity to present his side of the story at length—both in person and in writing […]." [R. 107 at 31.]

The Court declines to grant summary judgment for either party. On January 17, 2019, Provost Blackwell removed Dr. Shehata's ability to perform clinical duties. [R. 107 at 17; R. 71-4 at 21.] Despite the University's artful description of this removal as a "reassignment," it is evident that Dr. Shehata was no longer permitted to perform his clinical duties after January 2019 and was therefore deprived of his property interest. Although pre-deprivation hearings "need not be elaborate," the Sixth Circuit requires the "explanation of an employer's evidence" before a deprivation can occur.[6] *Lane*, 588 Fed. App'x at 465. At this point in litigation, it is not clear whether Dr. Shehata was provided a sufficient explanation of the evidence collected against

---

[6] Though the Sixth Circuit in *Lane* requires an explanation of evidence prior to termination of employment, the rationale of the *Lane* Court indicates that, for a hearing to be constitutionally sufficient, one must be provided an explanation of the evidence brought against them to support the deprivation of a property interest.

him to deem the January meeting a "hearing."  Moreover, although "months of back-and-forth negotiation" might have served as sufficient post-deprivation process, proper post-deprivation process cannot cure insufficient pre-deprivation process.  *See Mitchell v. Fankhauser*, 375 F.3d 477, 480 (6th Cir. 2004) ("[p]ost-termination hearings, on the other hand, 'serve to ferret out bias, pretext, deception and corruption by the employer in discharging the employee.'") (quoting *Duchesne v. Williams,* 849 F.2d 1004, 1008 (6th Cir. 1988)).  Accordingly, because there exists a genuine issue of material fact as to whether Dr. Shehata was provided a sufficient explanation of the evidence collected against him during his January 2019 meeting with Provost Blackwell, summary judgment is inappropriate.

Next, Dr. Shehata argues that he was not provided sufficient notice that his employment contract was not being renewed.  Consequently, Dr. Shehata argues that his constitutional right to due process was violated and that an implied contract was created to guarantee him an additional year of employment.  [*See* R. 71-4 at 29-30].  In support, Dr. Shehata points to University Regulation X, which indicates that [n]otification of non-renewal of appointment after more than two (2) years of service shall be given at least twelve (12) months before expiration of appointment."  [R 109 at 24.]  Accordingly, because he alleges that he was not given notice prior to September 2019 that his employment would expire in June 2020, Dr. Shehata argues that his constitutional rights were violated.  [*See* R. 71-4 at 29-30.]  In response, Defendants argue that Dr. Shehata was put on notice prior to June 2019, twelve months prior to the non-renewal of his employment contract.  For example, Defendants argue that Dr. Shehata was made aware of the potential of non-renewal during his January 2019 meeting with Provost Blackwell.  [R. 107 at 31.]  At the very latest, Defendants argue that Dr. Shehata was formally notified of the non-

13

renewal on August 28, 2020, when he was given a written letter which indicated as such. [R. 107 at 41.]

Upon review, the Court agrees with Defendants. First, although parties dispute whether Dr. Shehata was provided twelve-months' notice prior to the non-renewal of his contract, the question is whether the constitution's requirements were violated, not University internal policy. *See Doe v. Miami Univ.*, 882 F.3d 579, 603 (6th Cir. 2018) (stating that "a mere failure by the University to follow its own internal guidelines does not give rise to a procedural-due-process violation."). Even assuming Dr. Shehata was not provided notice until August 2019, the timing of the notice provided by the University is sufficient. Constitutionally sufficient notice must be

> reasonably calculated, under all the circumstances, to apprise interest parties of the pendency of the action and afford them an opportunity to present their objections. The notice must be . . . reasonably [calculated] to convey the required notice . . . [W]hen notice is a person's due, process which is a mere gesture is not due process.

*Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314-15, 70 S. Ct. 652, 94 L. Ed. 865 (1950). In its August 2019 letter to counsel of Dr. Shehata, the University clearly indicates that it will honor "Dr. Shehata's contract for the 2019-2020 fiscal year" if the parties were able to reach an agreement of terms, but explicitly indicated that Dr. Shehata had "no right or expectation to receive an employment contract for the 2020-2021 fiscal year." [R. 107-27.] Consequently, the University's letter put Dr. Shehata on sufficient notice that he could either defend his actions, thereby presenting his objections, and try to reach an agreement with the University, or have his 2019-2020 contract not honored. *See id.* Without regard to any potential breach of contract claim, Dr. Shehata was put on clear notice that his 2019-2020 contract might not be honored and that he was not to expect a contract renewal for the following year. *See id.* Accordingly, Dr. Shehata's procedural due process claim for the non-renewal of his contract fails. Moreover, because this letter clearly indicates that Dr. Shehata has "no right or

expectation" to an additional year of employment, no implied contract was created to extend his property interest in employment through the 2021 school year. *See Ramsey v. Allstate Ins. Co.*, 416 Fed. App'x 516, 521 (6th Cir. 2011) ("[i]n order to find a contract implied in fact, the surrounding circumstances must be such that the court can infer a contract exists as a matter of tacit understanding between the parties."). As a result, the Court will grant summary judgment in favor of Defendants regarding Dr. Shehata's procedural due process claim for non-renewal of contract and concludes that Dr. Shehata's property interest in his employment did not extend beyond June 2020.

**B**

Next, the Court turns to Dr. Shehata's breach of contract claim against the University. In his Motion, Dr. Shehata alleges that the University breached his written contract in three ways: by denying him Plan income for patient care services performed, by forbidding him from performing clinical activities, and by "prematurely" terminating him on June 30, 2020. [R. 109 at 31.] In response, the University argues that no breach occurred. [R. 107 at 34-42.] In Kentucky, a plaintiff must demonstrate three things to establish a breach of contract claim: 1) the existence of a contract; (2) breach of that contract; and 3) damages flowing from a breach of that contract. *Delmar v. Morgan*, 2015 U.S. Dist. LEXIS 4880 at *5 (W.D. Ky. Jan 15, 2015) (citing *Metro Louisville/Jefferson County Government v. Abma*, 326 S.W.3d 1, 8 (Ky. Ct. App. 2009) (citation omitted); *see also Fifth Third Bank v. Lincoln Financial Securities Corp.*, 453 F. App'x 589, 601 (6th Cir. 2011). Although the state is generally shielded from liability under the doctrine of sovereign immunity, KRS 45A.245 provides a limited waiver of immunity for contract claims brought against the Commonwealth derived from a written contract. Ky. Rev. Stat. Ann. 45A.245.

15

Dr. Shehata first alleges that the University denied him income for patient care services

he performed.  Dr. Shehata's 2013 employment contract, renewed yearly, provided as follows:

> As a dentist who is a full-time faculty member, you are also eligible to participate in the College's Dental Service Plan (DSP) which allows faculty members to receive income from patients care activities in College of Dentistry clinics or hospital operating rooms . . . You will be eligible for distribution of supplemental clinical income from patient care activities as governed by the standard Dental Service Plan policy. This policy currently provides that 40% of collected income from clinical patient care services provided during faculty time dedicated to "private patient care" and is available for quarterly distribution as [*sic*] the election of the faculty.

[R. No. 1-2 at 48-49.]  Moreover, the letter pointed Dr. Shehata to the University's

Administrative Regulations and Governing Regulations for further guidance.  *See id.*  Dr.

Shehata alleges that, through discovery, there were forty instances in which he provided "private

patient care," but he was not paid forty percent of the collection as provided in his employment

contract.  [R. 71-4 at 42.]  Because the collection for those forty instances totaled $941.75, Dr.

Shehata argues he is owed $376.70, with pre-judgment interest.  *Id.* (citing *Univ. of Louisville v.

RAM Engineering & Construction, Inc.*, 199 S.W.3d 746 (Ky. Ct. App. 2005).  In further

support, Dr. Shehata argues that *Britt v. Univ. of Louisville*, 2021 Ky. LEXIS 118 (Ky. March 25,

2021) controls.  In *Britt*, the Kentucky Supreme Court ruled that the University of Louisville

incorporated by reference into an employment contract the provisions of its administrative

regulations, called The Redbook, by including language that indicated that employment at the

University was "subject to" and "govern[ed]" by The Redbook.  *Id.* at *14-*15.  Although Dr.

Shehata does not indicate which documents he believes to have been incorporated by reference

in his employment contract, he insinuates that the University's regulations support his position

that he is owed additional income.  [*See* R. 71-4 at 40-41.]

In response, Defendants argue that Dr. Shehata's contract does not allow him the ability to designate whether he "treated" a patient for payment purposes and, instead, the designation process was properly handled by a third party.  Defendants also point out that the contract states that the Plan "currently" provides that Dr. Shehata could receive forty percent of the collection. [R. 107 at 36.]  Accordingly, Defendants provide that the contract permits flexibility and the alteration of the Plan.  *See id.*  Moreover, Defendants argue that no document is incorporated by reference and that, consequently, the only language binding the University is the employment contract itself. [7]  [R. 107 at 35-37.]  Finally, Defendants argue that the statute of limitations has run on Dr. Shehata's breach claim.  [R. 82.]  Under KRS 45A.260, any contract claim against the Commonwealth "shall be commenced [...] within one (1) year from the date of completion specified in the contract."  Ky. Rev. Stat. Ann. 45A.260.  Because each instance identified by Dr. Shehata in which he alleges he was not paid for his services occurred during his June 2017 through June 2018 appointment period, Defendants argue his claim expired in June 2019.  [R. 82 at 3.]

Dr. Shehata responds that he is not seeking the Court to interpret his employment contract to permit him to determine whether he "treated" his patients or whether a third-party could rightfully do so.  [*See* R. 109 at 32.]  Instead, Dr. Shehata indicates that he only seeks

---

[7] Specifically, Defendants state that a 2013 Guidance Document, which Dr. Shehata does not explicitly mention but has referenced throughout this litigation, is not incorporated by reference. *Id.* at 37.  The 2013 Guidance Document, which allegedly interpreted provisions of the Plan, indicated that, when a treating provider and a resident both oversee the treatment of a patient, the treating provider is to receive credit for the services and will thereby be eligible for forty percent of the collection.  [*Se* R. 70-1 at 2263-64.]  This policy was later altered to indicate that when both a treating provider and resident oversee the treatment of a patient, the College receives the full collection.  [R. 71-4 at 6.]  Dr. Shehata alleges that the 2017 update is not binding because it was not legislated through proper channels of internal administrative procedure.  [*See* R. 71-4 at 6-7.]

17

payment for services he performed and was promised payment. *Id.* Regarding Defendants'
statute of limitations argument, Dr. Shehata argues that the statute of limitations did not begin to
run until the services were billed, not performed, and that billing often occurs months after
services are performed by providers. [R. 93 at 2 ("[i]t is the date that DSP *should have been paid*
after the payments were collected that is the relevant date.").]

Ultimately, the Court concludes that the statute of limitations has likely expired for Dr.
Shehata's breach of contract claim for services provided. Although Dr. Shehata argues that the
statute of limitations does not run until payment for services has been billed, he provides no case
law in support of his position and cites no discovery regarding the dates that services were billed
from the University. Instead, Dr. Shehata states that he does not have specific information but
"it is believed" that the billing time would have fallen within the one-year period of the statute of
limitations. [R. 93 at 2.] Accordingly, there does not exist a genuine issue of material fact as to
whether the statute of limitations has run because Dr. Shehata provides no evidence, aside from
his own belief, to the contrary. *Keeneland Ass'n v. Eamer*, 830 F. Supp. 974, 984 (E.D. Ky.
1993) ("*Celotex* affirms that 'nonmoving parties must fulfill their burden of production' once the
moving party has met its burden of production.' [...] Once the moving party has met its burden
of production, 'its opponent must do more than simply show that there is some metaphysicial
doubt as to the material facts.'") (quoting first *Celotex Corp v. Catrett*, 477 U.S. 317, 324 (1986)
and then *Matsushita Elec. Indus. Co. v. Zenit Radio Corp.*, 475 U.S. 574, 586 (1986)). As such,
the Court will dismiss Dr. Shehata's claim for breach of contract for services provided as
untimely.

Next, Dr. Shehata alleges that the University breached his contract by forbidding him
from engaging in clinical practice. In support, Dr. Shehata argues that his employment contract

incorporated by reference the University's administrative regulations, including Governing Regulation X.  [R. 71-4 at 42-43.]  Regulation X limits the University's ability to suspend or assign a faculty member to other duties in lieu of suspension, "only if immediate harm to the faculty member or others is threatened by the faculty member's continuance…"  *Id.* at 42. Because Dr. Shehata argues that there existed no immediate threat of harm if he had remained able to perform his clinical duties, he alleges that the University breached its contract.  *See id.*  In response, Defendants argue that the Kentucky Supreme Court's holding in *Britt* is not controlling in this matter because the specific language of Dr. Shehata's employment contract does not indicate a mutual understanding that the University's administrative regulations were incorporated into the contract by reference.  [*See* R. 107 at 38-39.]  Defendants argue that, unlike in *Britt*, where language existed in the contract which indicated that the University of Louisville's regulations "govern[ed]" the employment contract, the employment contract at issue here simply mentions the University's administrative regulations as guidance for further information.  *See id.* (discussing *Britt v. Univ. of Louisville,* 2021 Ky. LEXIS 118 at *5).

Upon review, the Court agrees with Defendants.  The *Britt* court indicated that the University of Louisville's administrative regulations were incorporated by reference because of the specific language found in that contract.  *See id.*  Dr. Shehata's employment contract, conversely, does not state that the administrative regulations "govern" or that the contract is "subject to" the University's regulations.  [*See* R. 1-2 at 48.]  Instead, the contract simply mentions that the reader can find the administrative regulations by following a web link.  *See id.* As a result, the University's regulations are not incorporated by reference into Dr. Shehata's contract.  The University, however, cannot have its cake and eat it too.  Because its regulations are not incorporated by reference, the words on the face of the employment contract control. Dr.

Shehata's employment contract states that he is "eligible to participate in the College's Dental Service Plan (DSP) […]." *Id.*  Although the letter makes clear that the percentage of profit Dr. Shehata might make from performing services is "subject to change," it does not provide that Dr. Shehata's participation eligibility is subject to change. *See id.*  Although the administrative regulations describe when eligibility can be removed, the University argues that the regulations are not incorporated into its contract with Dr. Shehata.  Accordingly, because the contract states that Dr. Shehata will be eligible to participate in the Plan and the University removed his eligibility, the University breached its contract.[8]

Finally, Dr. Shehata alleges that the University breached its contract by failing to notify him twelve months before his contract was not renewed.  Both Governing Regulation X and Dr. Shehata's yearly contract renewal form, titled "Notice of Academic Appointment and Assignment," expressly indicate that "[n]otification of non-renewal of appointment after more than two years of service shall be given [*sic*] least 12 months before expiration of appointment." [R. 7-8.]  Consequently, because Dr. Shehata alleges that notice was not timely provided, he argues the University breached its contract.  In response, Defendants assert that Governing Regulation X has not been incorporated by reference and is therefore inapplicable.  [R. 107 at 40.]  The Court agrees and has already concluded as such.  Because this same clause is found in Dr. Shehata's contract renewal form, however, it remains binding.[9]  [R. 107 at 40; R. 7-8.]

---

[8] Compare to companion case, *Cunningham v. Blackwell, et al.*, 3:20-cv-00008-GFVT, denying summary judgment for Dr. Cunningham's similar claim against the University because the terms of Dr. Cunningham's contract are less definitive, rendering it more appropriate for a jury to determine whether his contract was breached.

[9] Though Defendants previously argued that the lack of Provost Blackwell's signature on Dr. Shehata's 2019 reappointment rendered it null, Defendants do not renew this argument.  Instead, it appears that Defendants concede that Dr. Shehata was properly reappointed from 2019-2020 but argue that timely notice was provided to him regarding the non-renewal of his contract for the 2020-2021 term.  [R. 107 at 19, 40-42.]

20

Regarding the timeliness of notice, Defendants argue that Dr. Shehata was first informed of the University's intention to terminate his contract in January 2019 at his initial meeting with Provost Blackwell.  [R. 107 at 40-41.]  And although Defendants argue that notice was proper from January 2019 onward, they argue further that notice was clearly provided in August 2019 when Dr. Shehata received a letter from General Counsel Thro indicating that his employment contract would not be renewed.  *Id.* at 41 ("[t]o be clear, even if Dr. Shehata's contract required 12 months' notice and the only way to achieve that was a formal letter […] the most Dr. Shehata would have been entitled to was employment through August 20, 2020.").

The Court agrees with Dr. Shehata.  "Notice, generally, may be defined as that which imparts information of the fact to the one to be notified […]."  *Burdine v. White*, 173 Ky. 158, 161 (Ky. 1917).  Although the University did insinuate that Dr. Shehata's employment would likely not be renewed, it did not explicitly notify him that his contract was not being renewed until September 2020.  Accordingly, Dr. Shehata was not "impart[ed] information of the fact" that his contract would not be renewed within twelve months of the non-renewal of his contract. For example, in January 2019, although Provost Blackwell accused Dr. Shehata of fraud and insinuated that he was under investigation, Dr. Shehata was permitted to remain employed so that Provost Blackwell could conduct further investigations.  [R. 71-4 at 21.]  Consequently, this meeting did not put Dr. Shehata on notice that his contract was not being renewed.  Moreover, though Defendants argue that the conduct of the parties between January and August 2019 put Dr. Shehata on notice that his contract would not be renewed, Dr. Shehata's reappointment form was signed by both the Dean of the College and Dr. Shehata's Department Chair in June 2019. [R. 107 at 19, 31; R. 7-8.]  It is illogical to argue that Dr. Shehata was aware that his contract would not be renewed when, in fact, he had just signed a contract renewal.  Finally, General

Counsel Thro's August 2019 letter to Dr. Shehata states that "[i]f we are unable to reach an agreement […]" Dr. Shehata's contract will not be renewed. [R. 107-27.]  Because this letter still left open the possibility of renewal if agreement was reached, it did not impart to Dr. Shehata that his contract would not be renewed.

As a result, it was not until September 19, 2019, when General Counsel Thro mailed a letter stating that "[t]he University has decided further settlement discussions with Dr. Shehata are pointless.  His employment will end on June 30, 2020 and he will not be assigned any clinical duties[]" that Dr. Shehata received notice that his contract would not be renewed.  [R. 1-2 at 68; *See Board of Education v.* Stevens, 261 Ky. 475, 480 (Ky. 1935) (finding that although the word "notice" does not necessarily imply written notice, it must still "convey[]" the necessary information)].  Before September 2019, the possibility of non-renewal was clearly present, but "notice" of non-renewal had not yet occurred.  Because notice of non-renewal was not provided to Dr. Shehata twelve months in advance, the University breached its contract and summary judgment is appropriate.

## C

The Court will next analyze Dr. Shehata's wage and hour claims against the University and Provost Blackwell under KRS 337.060.  KRS § 337.060 states that "[n]o employer shall withhold from any employee any part of the wage agreed upon," unless a statutory exception applies. Ky. Rev. Stat. Ann. 337.060.  Governmental immunity is waived for claims brought pursuant to KRS Chapter 337.  *Lipson v. Univ. of Louisville*, 556 S.W.3d 18, 29 (Ky. Ct. App. 2018).  As he alleged with his breach of contract claim, Dr. Shehata argues that the University owes him $376.70 plus pre-judgment interest for forty instances of unpaid labor in which he and the University had agreed that he would be paid for.  [*See* R. 71-4 at 43-44.]  In response,

Defendants argue that summary judgment is inappropriate because there exists a bona fide dispute as to whether the wages Dr. Shehata alleges are owed to him were "agreed upon" as required under the statute.  [R. 107 at 43-44.]  In support, Defendants cite to *Kimmel v. Progress Paint Mfg. Co.*, 2003 Ky. App. Unpub. LEXIS 1, *9 (Ky. Ct. App. January 10, 2003).  In *Kimmel*, the Kentucky Court of Appeals analyzed KRS 337.060 and found that, by including the requirement that wages must be "agreed upon," the Kentucky legislature did not intend the statute "to apply where there exists a bona fide dispute concerning wages."  2003 Ky. App. Unpub. LEXIS at *9.  Accordingly, the University argues that there exists a bona fide dispute as to whether Dr. Shehata or a third-party should have held the power to determine whether he "treated" a patient for payment purposes.  [R. 107 at 43-44.]  Moreover, though Dr. Shehata did not brief this argument, Defendants argue that Dr. Shehata cannot claim that the University and Provost Blackwell withheld his wages by forbidding him to perform clinical duties because he never "earned" any additional income he may have received upon performance.  *Id.* at 45.

The Court declines to grant summary judgment for either party because there exists a genuine issue of material fact as to whether the wages sought by Dr. Shehata were "agreed upon."  The Court notes, however, that simply because a genuine issue of material fact exists at summary judgment does not necessarily mean a bona fide dispute is present to warrant summary judgment.  Here, it remains unclear whether Dr. Shehata "treated" each patient in the instances he cites or whether a third party was properly permitted to determine who "treated" patients.[10]

---

[10] This requires a determination of whether the 2013 Guidance Document was binding on the College, whether the parties agreed to follow the 2013 Document, and whether the Guidance Document was properly updated by administrative procedure in 2017 as to alter the agreement. If the agreement between the parties indicated that internal procedure would be followed and the Guidance Document was correctly updated by internal procedure, Dr. Shehata is likely owed no wages under KRS 337.060.  Conversely, if the agreement between the parties did not indicate that internal procedure would be followed or if the Guidance Document was not updated

Because these questions could be answered at trial, however, the Court cannot confidently

conclude that a bona fide dispute is present at summary judgment as to render KRS 337.060 non-

binding.  The Court does grant summary judgment in favor of Defendants as to any argument

that Dr. Shehata is owed wages for work he did not perform, and, accordingly, will dismiss

Provost Blackwell from Plaintiff's wage and hour claim.[11]

### D

Now, the Court turns to the claims remaining in Defendants' Motion for Summary

Judgment [R. 107] that were not briefed in Dr. Shehata's Motion [R. 71-4.]  Defendants first

seek summary judgment against Dr. Shehata's substantive due process claim.  [R. 107 at 32-34.]

In his Complaint, Dr. Shehata alleges that Defendants violated his substantive due process rights

by making statements about his alleged misconduct to law enforcement officials, other UK

employees, and prospective employers.  [R. 55 at 13-14; R. 109 at 28-31.]  The substantive

component of the Due Process Clause protects fundamental rights created by the United States

Constitution.  Fundamental rights are those specifically guaranteed by the United States

Constitution and those rights that are "implicit in the concept of ordered liberty."  *Palko v.*

*Connecticut*, 302 U.S. 319, 325 (1937).  These generally include "the rights to marry, to have

children, to direct the education and upbringing of one's children, to marital privacy, to use

---

properly, it is likely that Dr. Shehata is owed wages. The University, however, cannot relieve
itself of its duty to pay agreed upon wages by simply arguing that its own, possibly faulty, update
of internal procedure creates a "bona fide dispute" as to render KRS 337.060 non-binding.
[11] This includes any potential wages that Dr. Shehata might have earned had his clinical
privileges not been withheld from him because KRS 337.060's protection does not extend further
than wages "agreed upon." Provost Blackwell is dismissed because there is no evidence that he
was involved in withholding any wages "agreed upon" from Dr. Shehata.  Instead, Dr. Shehata's
complaint makes clear that he sued Provost Blackwell for his alleged involvement in preventing
Dr. Shehata from performing his clinical duties and thereby receiving additional employment
income through the College's Dental Services Program.  [*See* R. 55 at 16.]

contraception, to bodily integrity, and to abortion." *Washington v. Glucksberg*, 521 U.S. 702,

720 (1997) (internal citations omitted). Substantive due process rights have been specifically

defined by the United States Supreme Court, and do not include the right to maintain

employment, public or otherwise. *See Seal v. Morgan*, 229 F.3d 567, 574-75 (6th Cir. 2000).

However, the Supreme Court has also clarified that:

> The concept of "liberty" recognizes two particular interests of a public employee:
> 1) the protection of his or her good name, reputation, honor, and integrity; and 2)
> his or her freedom to take advantage of other employment opportunities.

*Sullivan v. Brown*, 544 F.2d 279, 283 (6th Cir. 1976) (citing *Board of Regents v. Roth*, 408 U.S.

564, 573-74 (1972). Conduct that violates a party's substantive due process rights is conduct

that "shocks the conscience." *Mertik v. Blalock*, 983 F.2d 1353, 1367 (6th Cir. 1993) (citing

*McMaster v. Cabinet for Human Resources*, 824 F.2d 518, 22 (6th Cir. 1997).

Dr. Shehata alleges that Defendants Blackwell, Holloway, and Thro each violated his

right to his reputation and right to be free to pursue employment opportunities. [R. 109 at 29-

30.] First, Dr. Shehata asserts that Provost Blackwell, by removing his clinical privileges,

"signaled to [his] colleagues and the oral surgery community at large that [he] was impaired, had

committed fraud, abused patients, that [his] clinical skills had deteriorated, or the like." *Id.* at 29.

Dr. Shehata next argues that Dr. Holloway "told [his] colleagues at an August 5, 2019, Division

Chiefs' meeting that [he was] asked to resign because [he] committed fraud and claimed that this

finding was affirmed by the U.S. Attorneys' Office." *Id.* Finally, Dr. Shehata asserts that

General Counsel Thro violated his rights by reporting his alleged fraud to the United States

Attorney's Office. [*See* R. 109 at 4.] As a result of these alleged statements, Dr. Shehata argues

that his reputation and ability to take advantage of career opportunities was "jeopardized", as

evidenced by his inability to find a new job for eighteen months after having his clinical duties taken from him and by causing his professional skills to stagnate. [*See id.* at 29-30.]

In response, Defendants first argue that they never "directed anyone to tell patients that Dr. Shehata was prohibited from performing clinical duties," and that no evidence exists to indicate that they informed any of Dr. Shehata's potential employers of his alleged wrongdoing. [R. 107 at 32.] Specifically regarding General Counsel Thro, Defendants argue that, as General Counsel to the University, he had a duty to report any potential legal misconduct that an employee may have committed and, furthermore, did not reveal Dr. Shehata's identity to the U.S. Attorney's Office. *Id.* at 32-33. Second, Defendants argue that no statement referenced by Dr. Shehata "shocks the conscience" as to support a substantive due process claim for reputational injury. *Id.* at 33-34. In support, Defendants cite to *Mertik v. Blalock*. In *Mertik*, the Sixth Circuit agreed with a district court ruling that a city employee did not violate the substantive due process rights of a plaintiff who worked with children by falsely publicizing to third parties that she had committed child abuse. 983 F.2d at 1368. Defendants argue that, by deciding that allegations of criminal child abuse did not "shock the conscience," the Sixth Circuit established that the "shocks the conscience" test is a high bar to surpass. [R. 107 at 33-34.]

The Court agrees that summary judgment is warranted in this matter. Although it is likely that a genuine issue of material fact exists as to whether the Defendants published false statements about Dr. Shehata to third parties or whether those statements caused him injury, *Mertik* demands summary judgment be granted. Like the plaintiff in *Mertik*, Dr. Shehata was accused of a crime which likely had an impact on his reputation and ability to take advantage of other employment opportunities. Because Sixth Circuit precedent indicates that the "shocks the conscience" test is not satisfied by an employer publicly accusing an employee of child abuse

26

and pedophilia, however, the test likewise cannot be satisfied by an employer's accusation that an employee committed financial misconduct. Accordingly, because Dr. Shehata's substantive due process claim is based on statements that do not "shock the conscience," his claim against Defendants Blackwell, Holloway, and Thro is dismissed.

**E**

Defendants next seek summary judgment against Dr. Shehata's First Amendment retaliation claim. To establish a claim of First Amendment retaliation a plaintiff must prove "(1) he engaged in protected conduct, (2) the defendant took an adverse action that is capable of deterring a person of 'ordinary firmness from continuing to engage in that conduct,' and (3) 'the adverse action was motivated at least in part by the [plaintiff's] protected conduct.'" *Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010) (citing *Thaddeus-X v. Blatter*, 175 F.3d 378, 398 (6th Cir. 1999) (en banc)). Additionally, if the plaintiff is a public employee, the Sixth Circuit mandates the application of a two-step analysis to determine whether the action taken against him violates the First Amendment. "First, we must determine whether the employee was speaking as a government employee (rather than in his capacity as a private citizen) and whether the statement constitutes speech on a matter of public concern. If so, we then apply a balancing test to determine whether the interest in protecting speech on issues of public concern outweighs the interest of the government employer 'in promoting the efficiency of the public services it performs through its employees.'" *Ryan v. Blackwell*, 979 F.3d 519, 526 (6th Cir. 2020) (citations omitted). These two steps are required sub-elements of the first element of the First Amendment retaliation framework. *Id.* If that showing is made, the burden shifts to the defendant to show that the same action would have been taken absent plaintiff's exercise of protected conduct. *Id.*

27

Dr. Shehata alleges that the non-renewal of his employment contract was in retaliation because he would not agree to execute a sworn statement, to be included in his publicly accessible employment personnel file, which indicated that he had committed fraud. [R. 55 at 10.] The first question is whether Dr. Shehata engaged in protected conduct. Whether an employee's speech addressed a mater of public concern is a matter of law. *Van Compernolle v. City of Zeeland*, 241 F. Aoo'x 244, 249 (6th Cir. 2007). Defendants argue that Dr. Shehata's conduct was not protected conduct because it simply involved internal public employee misconduct and discipline. [R. 107 at 21-22 (citing *Ryan v. Blackwell*, 979 F.3d at 526 (indicating that 'internal personnel disputes or complaint about an employer's performance' are not matters of public concern).] Defendants assert that, because "Dr. Shehata's alleged speech involves only his own misconduct," *Blackwell* precludes its protection under the First Amendment. [*See* R. 107 at 22.] In response, Dr. Shehata argues that his conduct was of a public concern and was not "some petty internal grievance." [R. 109 at 15.] He states "Defendant Thro's letter to Dr. Shehata demanded that he admit to defrauding the government, which is the kind of thing that Mr. Thro himself garners media attention and warrants a call to the U.S. Attorney's Office. This is not 'speech purely concerning personnel matters.'" *Id.*

The Court agrees with Dr. Shehata. First, this matter does not simply involve an internal grievance. In *Blackwell*, after being accused of and cleared of criminal conduct by his employer, the Plaintiff alleged that he was defamed and constructively discharged after asking in a public forum why his employer had "attempted to fire him" through the use of its internal grievance procedure. *See* 979 F.3d at 527. Because the alleged retaliation resulted from a confrontation about the Defendant's use of an internal procedure, the Sixth Circuit ruled that the Plaintiff had not spoken on a matter of public concern. *See id.* Here, however, Defendants requested that Dr.

Shehata publicly admit that he had committed healthcare fraud.  The topic which allegedly led to retaliation, therefore, was not the use of an internal procedure, but, instead, was Dr. Shehata's refusal to admit to a crime that he asserts he did not commit.  *See Jackler v. Byrne*, 658 F.3d 225, 241 (2d. Cir. 2011) ("the First Amendment protects the right[] of a citizen […] to refuse to make a statement that he believes is false […].").[12]

Because Dr. Shehata was engaged in conduct protected by the First Amendment and he is a public employee, the Court must next determine whether his actions satisfy the sub-elements mandated under *Blackwell*.  First, it is evident that Dr. Shehata was acting as a private citizen and not as a government employee when he refused to speak.  Although the topic that he refused to speak about was related to his public employment, Dr. Shehata's choice was personal and was not made on behalf of his public employer or in the course of his employment.  *See Bennett v. Metro. Gov't of Nashville & Davidson City*, 977 F.3d 530, n. 1 (6th Cir. 2020) (ruling that a plaintiff public employee's use of a racial slur on social media satisfied prong one because her post was not made in the course of her employment).  Sub-element two requires the Court to undergo a balancing test to determine whether Dr. Shehata's "free speech interests outweigh the efficiency interests of the government as employer."  *Bennett*, 977 F.3d at 539 (citing *Gillis v.*

---

[12] Moreover, Defendants assert that Dr. Shehata did not engage in protected conduct by refusing to speak a perceived falsehood because, in a letter sent to General Counsel Thro, Dr. Shehata agreed to admit that he had committed fraud but refused to do so publicly.  [R. 107 at 23; Exhibit 29.]  This argument, however, is not dispositive.  It is evident from Dr. Shehata's conduct, including the filing of this lawsuit, that he vehemently believes that he did not commit fraud.  Dr. Shehata's agreeance to speak a perceived falsehood in secret, fueled by his desire to keep his job and under direct requirement of the University, does not negate his refusal to speak a perceived falsehood publicly or render it unprotected First Amendment conduct.  Though not necessarily controlling in this matter, the policy rationale behind Federal Rule of Evidence 408 regarding compromise offers and negotiations is instructive in this scenario.  *See* Fed. R. Evid. 408 and accompanying notes.

*Miller*, 845 F.3d 677, 684 (6th Cir. 2017)).  The Sixth Circuit explains that the "pertinent

considerations" for the balancing test are:

> [w]hether the statement [(a)] impairs discipline by superiors or harmony among
> co-workers, [(b)] has a detrimental impact on close working relationships for
> which personal loyalty and confidence are necessary, [(c)] impedes the
> performance of the speaker's duties or interferes with the regular operation of the
> enterprise, or (d) undermines the mission of the employer.  The consideration of
> the employee's performance, impaired discipline by superiors, harmony among
> co-workers, and undermining of the office's mission is "focuse[d] on the effective
> functioning of the public employer's enterprise."

*Bennett*, 977 F.3d at 539-540 (citations omitted).  Upon review of the pertinent considerations,

the Court concludes that Dr. Shehata's free speech interest outweighs the efficiency interest of

the University.  First, no evidence suggests that forcing Dr. Shehata to publicly confess to a

crime that he asserts he did not commit would impair the University's ability to discipline its

employees or maintain harmony among co-workers; if the University truly believed that Dr.

Shehata acted fraudulently, it could punish him by various means other than through forced

speech.  Likewise, no evidence indicates that electing to not force Dr. Shehata to speak would

impact any close relationships at the University.  Factor three weighs in favor of Dr. Shehata

because forcing Dr. Shehata to publicly admit to a crime that he asserts he did not commit would

negatively impact his career, job duties, and ability to treat patients.  Finally, though the

University's mission, which includes promoting the healthcare of the Commonwealth, could be

undermined by crimes committed by employees, there is no evidence that the only way to punish

or correct fraudulent activity at the University is through the public admission of crime.

Accordingly, the balance test weighs in favor of Dr. Shehata's free speech interests.

Having determined that Dr. Shehata spoke on a matter of public concern, the Court must

next determine whether the University "'took an adverse action that is capable of deterring a

person of 'ordinary firmness from continuing to engage in that conduct,' and whether 'the

adverse action was motivated at least in part by the [plaintiff's] protected conduct.'" *Hill*, 630

F.3d at 472.  If these conditions are satisfied, the University must show that it would have

engaged in the same action regardless of Dr. Shehata's engagement in protected conduct.

*Blackwell*, 979 F.3d at 526.   The Court concludes that both additional conditions are satisfied,

and that the University cannot meet its burden.  First, requiring an employee to admit to criminal

conduct to maintain their public employment clearly encourages one to forsake their First

Amendment right to not speak a perceived falsehood.  Second, despite the University's argument

that no causal connection is present because it informed Dr. Shehata that his contract would not

be renewed prior to his refusal to speak, discovery in this matter indicates that the University did

not reach a final decision regarding the renewal issue until Dr. Shehata refused to admit he had

committed fraud.  It was at that time that further negotiations were deemed "pointless."  [R. 1-2

at 68.]  Finally, because the University's decision regarding whether Dr. Shehata's contract

would not be renewed waivered until he refused to speak, the University cannot meet its burden

and prove that it would have taken the same action regardless of Dr. Shehata's engagement in

protected First Amendment conduct.  Accordingly, the Court finds that the University, through

its employee agents, engaged in First Amendment retaliation against Dr. Shehata.

### F

Next, the Court turns to Defendants' remaining arguments that qualified immunity

shields them from liability.  [R. 107 at 46-49.]  Qualified immunity is a doctrine that shields

government officials, including public university administrators, who perform discretionary

functions from civil liability "unless their conduct violates clearly established rights."  *Quigley v.*

*Tuong Vinh Thai*, 707 F.3d 675, 680 (6th Cir. 2013) (citing *Bishop v. Hackel*, 636 F.3d 757, 765

(6th Cir. 2011)); *see also Corbett v. Garland*, 228 F. App'x 525, 529 (6th Cir. 2007)

(finding qualified-immunity defense applied to university president and reversing district court's order granting plaintiff's motion for summary judgment). The question of whether qualified immunity attaches to an official's actions "is a purely legal question for the trial judge to determine prior to trial." *Garvie v. Jackson*, 845 F.2d 647, 649 (6th Cir. 1988). "[A] defendant is entitled to qualified immunity on summary judgment unless the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 232, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009). Either prong may be addressed first, depending on the circumstances of the case before the court, and both prongs must be satisfied for the plaintiff to demonstrate that the defendant is not entitled to qualified immunity. *See Pearson*, 555 U.S. at 236; *see also Sumpter v. Wayne Cty.*, 868 F.3d 473, 480 (6th Cir. 2017) ("A plaintiff must satisfy both inquiries in order to defeat the assertion of qualified immunity.") (citing *Wesley v. Campbell*, 779 F.3d 421, 428-29 (6th Cir. 2015)).

The term "clearly established" means that the law was, at the time of the individual's conduct, "'sufficiently clear' that every 'reasonable official would understand that what he is doing' is unlawful" and the law placed the constitutionality of the conduct "beyond debate." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589, 199 L. Ed. 2d 453 (2018) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). A legal principle must also have a "sufficiently clear foundation in then-existing precedent" and be "settled law" to be clearly established. *Id.* Once qualified immunity has been invoked, the plaintiff bears the burden of showing that qualified immunity is not appropriate. *Quigley*, 707 F.3d at 681 (citing *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006)).

Having been unsuccessful in attaining summary judgment on the merits, two constitutional claims remain pending against Defendants: Dr. Shehata's procedural due process claim regarding the revocation of his clinical duties and Dr. Shehata's First Amendment retaliation claim.  Because the Court has determined that Dr. Shehata's constitutional rights had likely been violated by Defendants under both claims, it must now be determined whether the law was "clearly established" as to preclude those violations.  Regarding the pending procedural due process claim, Defendants argue qualified immunity shields them from liability because the law was not clearly established that a doctor has a protected property interest in his or her clinical duties.  [R. 107 at 47.]  In response, Dr. Shehata argues that Defendants cite to no case which precludes every doctor from possessing a property interest in his clinical duties, but, instead, only cited to case law which indicates that, in certain situations, the property interest might not be present.  [R. 109 at 40.]

The Court agrees with Dr. Shehata because the Sixth Circuit has clearly established that a doctor holds a property interest in his clinical duties.  In *Crabtree v. Cookeville*, a doctor was suspended from his clinical duties for one day before he was given a hearing to determine whether he had committed misconduct.  1989 U.S. App. LEXIS 17554 at *4 (6th Cir. 1989).  Though the parties agreed that the Plaintiff doctor held a property interest in his clinical duties, the Court declined to determine whether his interest had been violated because his one-day suspension was deemed de minimis.  *See id.* at *5-*7.  However, the Court, also in agreement that a property interest did exist, indicated:

> [i]f Dr. Crabtree had been suspended for two weeks or if the suspension were punitive, he probably would be entitled to some sort of notice and opportunity to respond before the deprivation unless an emergency required immediate suspension. But because the deprivation of property was de minimis, we need not go into an extended analysis of what process would be required if the deprivation had been greater.

33

*Id.* at \*6-\*7.  In this matter, Dr. Shehata was forbidden from engaging in clinical practice for roughly eighteen months.  Because the Sixth Circuit ruled that a *two-week* suspension would "probably" require notice and a hearing, it is illogical for Defendants to argue that a suspension of *eighteen months* would not meet the threshold of a deprivation.  Moreover, the Sixth Circuit clearly indicates that clinical duties are a property interest because the Court stated described the doctor's suspension from clinical duties as a "deprivation of *property*," albeit one which was situationally de minimis.  *See id.*  Consequently, the law was settled decades before any potential deprivation committed by Defendants and, as a result, qualified immunity does not act as a shield from liability. *See also Benjamin v. Schuller*, 400 F.Supp.2d 1055 (S.D. OH. 2005) (addressing the sufficiency of a hearing in which a doctor's clinical privileges were revoked and thereby clearly finding the presence of a protected interest).

Defendants also argue that Dr. Shehata's pending First Amendment retaliation claim is precluded by qualified immunity. In support of their position, Defendants cite to case law that indicates that internal employment grievances are not topics of public concern protected by the First Amendment.  [R. 107 at 46.]  Moreover, in response, Dr. Shehata argues that "the law has been clearly established that a public employee's free speech rights encompass the right not to speak, and that a public employee may not be subjected to adverse employment action as retaliation for exercising his free speech rights on a matter of public concern."  [R. 109 at 38 (citing *Langford v. Lane*, 921 F.2d 677, 680 (6th Cir. 1991) and then *Kiessel v. Oltersdorf*, 459 F. App'x 510, 515 (6th Cir. 2013).]  Upon review, however, the Court agrees with Defendants. First, the Court has already concluded that Dr. Shehata's refusal to speak did involve a matter of public concern.  Second, although the case law that Dr. Shehata cites does describe concepts that have been clearly established, this case involves whether an employee could be forced to speak

by his public employer, an apparent concept of first impression in this Circuit.  Accordingly, the law is not "sufficiently clear" or "settled," and the Court will dismiss Dr. Shehata's First Amendment retaliation claim as to Defendants Thro, Holloway, and Blackwell.

## G

Finally, the Court turns to Defendants' argument that Dr. Shehata has failed to provide sufficient evidence that the actions of General Counsel Thro or Dean Holloway caused Dr. Shehata's harms.  Accordingly, Defendants seek dismissal of General Counsel Thro and Dean Holloway from all claims.  [R. 107 at 49.]  Regarding Mr. Thro, Defendants assert that, as legal counsel, he could take no action against Dr. Shehata and, instead, simply advised other members of the University administration.  *Id.*  Regarding Dean Holloway, Defendants state that "Dr. Blackwell [] was the decision-maker concerning Dr. Shehata's reassignment and the decision to not renew his contract," and, therefore, Dean Holloway cannot be held liable.  *Id.* at 50. In response, Dr. Shehata argues that the decision to cause him harm resulted from a "joint effort" of all Defendants, including Mr. Thro and Dean Holloway.  Accordingly, he asserts that a genuine issue of material fact exists as to their liability, and they should not be dismissed.  The Court agrees with Dr. Shehata that a genuine issue of a material fact exists.

## III

So, where do these rulings leave Dr. Shehata's claims against the University Defendants? First, Dr. Shehata's procedural due process claim remains, but only the issue of whether the hearing he received prior to the revocation of his clinical duties was sufficient.  Second, Dr. Shehata's wage and hour claim remains, but only for work performed, and only against the University.  Moreover, there remains an open question as to whether the wages Dr. Shehata's alleges he is owed were "agreed upon."  Aside from these issues, the remainder of Dr. Shehata's

claims against the University defendants have been resolved in favor of one party or the other. Accordingly, and the Court being otherwise sufficiently advised, it is hereby **ORDERED** as follows:

1. Dr. Shehata's Motion for Summary Judgment [R. 71] is **GRANTED AND DENIED IN PART**.  Summary judgment is **GRANTED** in favor of Dr. Shehata against the University of Kentucky as to the subparts of Count IV regarding the contractual requirement that Dr. Shehata be eligible to participate in clinical activities and be given twelve-months' notice prior to the non-renewal of his contract;

2. Defendants Blackwell, Holloway, Thro, and the University of Kentucky's Motion for Summary Judgment [R. 107] is **GRANTED AND DENIED IN PART**. Summary Judgment is **GRANTED** in favor of the University as to the subpart of Count IV regarding alleged unpaid services.  Summary judgment is **GRANTED** in favor of Defendants Blackwell, Holloway, and Thro as to Count III.  Summary judgment is **GRANTED** in favor of Defendants Blackwell, Holloway, and Thro as to Count I. Summary judgment is **GRANTED** in favor of Defendants Blackwell, Holloway, and Thro as to the subpart of Count II regarding the non-renewal of Dr. Shehata's contract. Summary judgment is **GRANTED** for Provost Blackwell as to Count V.

3. The Court **DENIES** summary judgment in favor of either party as to the subpart of Count II regarding the revocation of Dr. Shehata's clinical duties.  The Court **DENIES** summary judgment for both Dr. Shehata and the University for Count V.

This the 21st day of October, 2021.

Gregory F. Van Tatenhove
United States District Judge