UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

| | |
|---|---|
| DR. EHAB SHEHATA, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>STEPHANOS KYRKANIDES, *et al.*, )<br>)<br>Defendants. )<br>)<br>)<br>) | Civil No. 3:20-cv-00012-GFVT-EBA<br><br>**MEMORANDUM OPINION**<br>**&**<br>**ORDER** |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on Defendant Stephanos Kyrkanides's Motion for Summary Judgment [R. 77-3.] Between January 2019 and June 2020, Dr. Ehab Shehata, an employee of the University of Kentucky College of Dentistry accused of health care fraud, was forbidden from engaging in clinical activities and had his employment contract terminated. [R. 67 at 3-6.] In response, Dr. Shehata filed suit against multiple defendants including Stephanos Kyrkanides, a former Dean of the University of Kentucky College of Dentistry. [R. 1.] In his Complaint, Dr. Shehata accuses Dr. Kyrkanides of violating his procedural and substantive due process rights, defaming him, and violating Kentucky wage and hour law. *Id.* Dr. Kyrkanides now moves for summary judgment in his favor. [R. 77-3.] For the reasons set forth herein, Dr. Kyrkanides's Motion [R. 77-3] will be **GRANTED IN PART** and **DENIED IN PART**.

**I**

Dr. Ehab Shehata was employed at the College as both an oral and maxillofacial surgeon and as a clinical title series assistant professor from 2013 through June of 2020. [R. 71-4 at 1; R.

107 at 3.] Dr. Stephanos Kyrkanides served as the Dean of the College from 2013 until January 16, 2019. [R. 77-3 at 6, 12.] In 2018, the office of the UK Healthcare Corporate Compliance began an investigation of Dr. Shehata regarding a "documentation concern," which was later concluded without disciplinary action. [R. 71-4 at 12.] On January 17, 2019, however, the day after Dr. Kyrkanides was removed as Dean, Provost Blackwell of the University of Kentucky informed Dr. Shehata that he was accused of fraud for "claiming credit for services which he did not perform." *Id.* at 21. Though Provost Blackwell allegedly indicated that "he was not comfortable pursuing termination at that time," he forbade Dr. Shehata from performing any clinical activities. *Id.* at 21-22. As a result of this action, Dr. Shehata was not allowed to treat patients in the faculty clinic, not allowed to perform surgery at UK Chandler Hospital, not allowed to oversee residents' and interns' patient care, not allowed to teach clinical courses, and was forbidden from working at the Veterans' Administration Hospital. *See id.* at 23.

On June 24, 2019, in the midst of the ongoing investigation into his billing practices, Dr. Shehata signed his annual appointment and assignment contract, which he believed to guarantee him an additional two years of employment at the College. [R. 71-4 at 29-30.] In August 2019, however, Dr. Shehata was presented a letter through UK's counsel, William Thro, indicating that, only if he agreed to certain conditions, including an admission of wrongful conduct, would his contract be renewed. *Id.* Dr. Shehata did not agree to the terms included in the letter, and, as a result, was informed by Mr. Thro that his employment at UK would end on June 30, 2020. *Id.* at 30. On January 16, 2020, Dr. Shehata filed a Complaint against multiple defendants alleging violations of his procedural and substantive due process rights, defamation, First Amendment retaliation, breach of contract, and violations of Kentucky wage and hour law. [R. 1.] Dr. Shehata accused Dr. Kyrkanides of involvement in his procedural and substantive due process

claims, defamation claim, and Kentucky wage and hour law claim. *See id.* Now, Dr. Kyrkanides moves for summary judgment in his favor and his Motion is ripe for review.

## II

Summary judgment is appropriate when the pleadings, discovery materials, and other documents in the record show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-25 (1986). "A genuine dispute exists on a material fact, and thus summary judgment is improper, if the evidence shows 'that a reasonable jury could return a verdict for the nonmoving party.'" *Olinger v. Corp. of the Pres. of the Church*, 521 F. Supp. 2d 577, 582 (E.D. Ky. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). The moving party has the initial burden of demonstrating the basis for its motion and identifying those parts of the record that establish the absence of a genuine issue of material fact. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). The movant may satisfy its burden by showing "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp.*, 477 U.S. at 325. Once the movant has satisfied this burden, the non-moving party must go beyond the pleadings and come forward with specific facts demonstrating there is a genuine issue in dispute. *Hall Holding*, 285 F.3d at 424 (citing *Celotex Corp.*, 477 U.S. at 324).

The Court must then determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson*, 477 U.S. at 251-52). In doing so, the Court must review the facts and draw all reasonable inferences in favor of the non-moving party. *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001). Summary judgment is inappropriate where there is a genuine

conflict "in the evidence, with affirmative support on both sides, and where the question is which witness to believe." *Dawson v. Dorman*, 528 F. App'x 450, 452 (6th Cir. 2013).

### A

The Court first turns to Dr. Kyrkanides's argument that summary judgment should be granted in his favor against Dr. Shehata's procedural due process claim. [R. 77-3 at 27-32.] In his Complaint, Dr. Shehata alleges that the defendants, including Dr. Kyrkanides, violated his procedural due process rights by failing to provide him due process prior to revoking his ability to perform clinical duties and by giving him improper notice prior to the non-renewal of his contract. [R. 55 at 11-13.] The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides that "No State shall deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. The procedural component of the Due Process Clause protects rights created by state law and guarantees that no significant deprivation of life, liberty or property will take place until notice has been provided and the individual has a meaningful opportunity to be heard. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985). In *Kentucky Department of Corrections v. Thompson*, 490 U.S. 454, 109 S. Ct. 1904, 104 L. Ed. 2d 506 (1989), the United States Supreme Court stated:

> We examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State, *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 571, 92 S. Ct. 2701, 2706, 33 L.Ed.2d 548 (1972); the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient, *Hewitt v. Helms*, 459 U.S. at 472, 103 S.Ct. at 871, 74 L. Ed. 2d 675. The types of interests that constitute "liberty" and "property" for Fourteenth Amendment purposes are not unlimited; the interest must rise to more than "an abstract need or desire," *Board of Regents v. Roth*, 408 U.S. at 577, 92 S. Ct. at 2709, and must be based on more than "a unilateral hope," *Connecticut Board of Pardons v. Dumschat*, 452 U.S. 458, 465, 101 S.Ct. 2460, 2464, 69 L.Ed.2d 158 (1981). Rather, an individual claiming a protected interest must have a legitimate claim of entitlement to it.

*Thompson*, 490 U.S. at 460.

By prior Order, the Court concluded that Dr. Shehata held a property interest in both his clinical duties and employment. [R. 136 at 8.] The Court further ruled that Dr. Shehata's clinical duties may have been revoked without due process, but that he had been given proper notice of the non-renewal of his contract. *Id.* at 14-15. Accordingly, multiple other defendants were granted summary judgment as to the non-renewal of Dr. Shehata's contract but neither party was granted summary judgment as to the process provided to Dr. Shehata resulting in the revocation of his ability to perform clinical duties. *Id.* at 8. In the present Motion, Dr. Kyrkanides does not argue that the Court's prior Order is substantively incorrect. Instead, he argues that, because he was removed from his position as Dean of the College on January 16, 2019, the day before Dr. Shehata's clinical duties were revoked, he was not involved in any alleged procedural due process violations which occurred on or after January 17. [*See* R. 77-3 at 26-32.] Specifically, Dr. Kyrkanides argues that he did not demote Dr. Shehata, reduce his salary, alter his job duties, take away any of the benefits of his employment, or initiate the investigation into his billing practices. *Id.* at 27. In response, Dr. Shehata argues that, although Dr. Kyrkanides was demoted prior to the revocation of his clinical duties, Dr. Kyrkanides was engaged in a civil conspiracy to cause him harm with the remaining defendants in this matter. [*See* R. 90 at 11 (citing *Hooks v. Hooks*, 771 F.2d 935, 944-45 (6th Cir. 1985)).] Dr. Shehata further alleges that, regardless of the presence of a civil conspiracy, Dr. Kyrkanides can be held liable under a "cat's paw" theory. *Id.*

Upon review, the Court agrees with Dr. Kyrkanides. First, Plaintiff provides insufficient evidence that a civil conspiracy exists. The Sixth Circuit defines a civil conspiracy as:

5

> [A]n agreement between two or more persons to injure another by unlawful action. Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy. Each conspirator need not have known all of the details of the illegal plan or all of the participants involved. All that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant.

*Hooks*, 771 F.2d at 943-44 (citations omitted). "Because direct evidence of conspiracy is rarely available, it is enough to produce circumstantial evidence sufficient to reasonably infer the existence of a conspiracy." *Womack v. Conley*, 595 Fed. App'x 489, 494 (6th Cir. 2014). Although Dr. Shehata does not explain his position clearly, the Court surmises him to argue that circumstantial evidence exists in this case to infer the existence of a conspiracy between Dr. Kyrkanides and one or more co-defendants to violate his procedural due process rights. In support of this position, Dr. Shehata points to a contentious history between Dr. Kyrkanides and Dr. Cunningham, a Plaintiff in a related matter to this case. [*See* R. 90.] Dr. Shehata also refers to an email that Dr. Kyrkanides sent to himself listing the punishments that he wished Dr. Shehata to receive for allegedly committing fraud, including that "[Dr. Shehata's] faculty practice [be] revoked immediately." [R. 90 at 12.]

Dr. Shehata's evidence, however, does not indicate the presence of an "single plan" between Dr. Kyrkanides and any co-defendant. Although Dr. Kyrkanides expressed his desire for Dr. Shehata to be punished, the evidence of this desire is located in an email sent to himself. [R. 90-3.] Moreover, Provost Blackwell, who forbade Dr. Shehata from performing his clinical duties, indicated that it was he and Dr. Holloway who made the revocation decision "in consultation," not he and Dr. Kyrkanides. [R. 77-5 at 349.] Finally, Dr. Blackwell indicated that Dr. Kyrkanides "could not have been viewed as objective," and so he intentionally made sure to not include Dr. Kyrkanides in the decision-making process. [*See* R. 66-1 at 116.] Accordingly,

6

because the evidence indicates that the remaining defendants in this matter intentionally excluded Dr. Kyrkanides from the decision to revoke Dr. Shehata's clinical duties and because Dr. Shehata has not provided sufficient evidence to establish a genuine issue of material fact as to whether a single plan existed between Dr. Kyrkanides and the co-defendants in this matter, Dr. Shehata's civil conspiracy argument fails.

Dr. Shehata's theory that Dr. Kyrkanides violated his procedural due process rights by acting as the "cat's paw" also fails.  Under the cat's paw theory of liability, one who holds a discriminatory intent and influences an ultimate decisionmaker may be deemed liable for harm caused.  *See Bose v. Bea*, 947 F.3d 983, 990-91 (6th Cir. 2020) (quoting *Seoane-Vazquez v. Ohio State Univ.*, 577 F. App'x 418, 427 (6th Cir. 2014) ("[u]nder a cat's paw theory, the decisionmaker need not have notice of the subordinate's discriminatory purpose. The cat's paw theory, rather, imputes knowledge and discriminatory intent- the cat's paw is the 'unwitting tool' of those with the retaliatory motive.")).  The Sixth Circuit, however, has not expanded the cat's paw theory of liability to Section 1983 claims.  *See Bose*, 947 F.3d at 991, n.4.  Though Dr. Shehata alleges, by bare assertion, that the cat's paw theory applies in this case, his argument is without legal support.  [R. 90 at 11.]  Accordingly, the Court will grant summary judgment in favor of Dr. Kyrkanides.

**B**

Dr. Kyrkanides next argues that he should be awarded summary judgment against Dr. Shehata's substantive due process claim.  [R. 77-3 at 26-32.]  As with Dr. Shehata's procedural due process argument, Dr. Kyrkanides contends that he was not involved in violating Dr. Shehata's substantive due process right to his reputation.  *Id.*  Although, in response, Dr. Shehata argues that Dr. Kyrkanides can be deemed liable through his involvement in a civil conspiracy or

7

under the cat's paw theory, he does not explain how Dr. Kyrkanides conspired to violate his reputation. Moreover, though Dr. Shehata provides statements made by Dr. Kyrkanides in which he is accused of committing fraud and engaging in illegal activity, he provides no evidence of an express agreement to harm his reputation. [*See* R. 90 at 8-9.] Additionally, by prior Order, the Court has ruled that Defendants' accusations of fraud against Dr. Shehata do not "shock the conscience" as to constitute a substantive due process violation. [R. 136 at 26-27 (citing *Mertik v. Blalock*, 983 F.2d 1353, 1369 (6th Cir. 1993)).] As a result, even if Dr. Shehata had proven the presence of a civil conspiracy or cited case law that expands the cat's paw theory to Section 1983 cases, the statements made by Dr. Kyrkanides would still fail to support a constitutional claim. Accordingly, summary judgment in favor of Dr. Kyrkanides is appropriate.

## C

The Court next turns to Dr. Kyrkanides's request for summary judgment in his favor against Dr. Shehata's Kentucky wage and hour claim. In Count V of his Complaint, Dr. Shehata alleges that Defendants, including Dr. Kyrkanides, deprived him of his wages in violation of KRS Chapter 337. [R. 55 at 17-19.] Specifically, Dr. Shehata alleges that Defendants withheld wages he earned from treating patients and that Defendants prevented him from earning additional income by revoking his clinical duties. *Id.* By previous Order, the Court concluded that Dr. Shehata was not entitled to additional wages he had not "earned" under KRS Chapter 337. [R. 136 at 23-24.] Accordingly, to the extent Dr. Sheahta seeks wages from income he did not earn, even if by fault of the Defendants, Dr. Kyrkanides is entitled to summary judgment. The Court also concluded, however, that there exists a genuine issue of material fact as to whether Dr. Shehata is entitled to wages he earned before Dr. Kyrkanides was demoted form his position of Dean. [R. 136 at 23-24. (citing *Kimmel v. Progress Paint Mfg. Co.*, 2003 Ky. App.

8

Unpub. LEXIS 1, *9 (Ky. Ct. App. January 10, 2003) (holding that wages are not owed under KRS 337.060 if there exists a bona fide dispute as to whether the wages were "agreed upon.").] Because it is more appropriate for a jury to determine whether a bona fide dispute exists as to whether Dr. Shehata is owed wages under KRS 337, the Court declines to grant summary judgment in favor of either party.  Moreover, though Dr. Kyrkanides briefly asserts that Kentucky qualified immunity law shields him from liability, this argument is not briefed thoroughly and does not allow the Court to analyze its applicability.  [*See* R. 77-3 at 30; *see also Williamson v. Recovery Ltd. P'ship*, 731 F.3d 608, 621 (6th Cir. 2013) ("[i]ssues adverted to in a perfunctory manner, without some effort to develop an argument, are deemed forfeited.")].  Accordingly, the Court declines to grant summary judgment on qualified immunity grounds.

**D**

Finally, Dr. Kyrkanides seeks summary judgment against Dr. Shehata's defamation claim.  [R. 77-3 at 33-37.]  By interrogatory, Dr. Shehata lists nine communications made by Dr. Kyrkanides that he claims to be defamatory.  [R. 77-5 at 445-451.]  In response, Dr. Kyrkanides argues that Dr. Shehata's defamation claim is barred by the statute of limitations and, alternatively, that he is protected by a qualified privilege.  [R. 77-3 at 33-37.]

The Court first turns to Dr. Kyrkanides's statute of limitations argument.  Defamation claims in Kentucky are governed by a one-year statute of limitations.  Ky. Rev. Stat. Ann. § 413.140(1)(d).  The cause of action accrues when the allegedly slanderous or defamatory statement is published or made.  *See Caslin v. Gen. Elec. Co.*, 608 S.W.2d 69, 70 (Ky. Ct. App. 1980)).  "The notion of 'publication' is a term of art, and defamatory language is 'published' when it is intentionally or negligently communicated to someone other than the party defamed." *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 794 (Ky. 2004).  Here, the first allegedly

9

defamatory statement was made on June 14, 2018, and the final statement was made on October 14, 2019. [R. 77-5 at 445-451.] Dr. Shehata filed his original Complaint on January 16, 2020 and did not include a defamation claim against Dr. Kyrkanides. [R. 1-2.] Dr. Shehata amended his Complaint on March 22, 2021, however, to include a claim of defamation against Dr. Kyrkanides. [R. 55.] Accordingly, any statement made before January 16, 2019 is time barred and cannot be used to support a claim of defamation. Thus, communications one through eight are time barred from use. The final communication made by Dr. Kyrkanides, dated October 4, 2019, however, survives under the doctrine of relation back. Though Dr. Shehata's Amended Complaint in this matter was filed beyond the running of the statute of limitations, his original Complaint was filed prior to its expiration. *Hall v. Spencer County, Kentucky*, 583 F.3d 930, 934 (6th Cir. 2009) (citing first *Miller v. American Heavy Lift Shopping*, 231 F.3d 242, 248 (6th Cir. 2000) and then Fed. R. Civ. P. 15(c)) ("[i]n short, 'a court will permit a party to add even a new legal theory in an amended pleading as long as it arises out of the same transaction or occurrence'); *see also Lynn v. Allstate Prop. & Cas. Co.*, 2010 U.S. Dist. LEXIS 163740 at *6 (holding that a Plaintiff's newly added claim related back to the date of the filing of his original Complaint).

      Because one allegedly defamatory statement remains, the Court next analyzes whether Dr. Kyrkanides is shielded from liability by a qualified privilege. In Kentucky, a qualified or conditional privilege attaches to communications "made in good faith, without actual malice, by one who believes he has a duty or an interest to a person with a corresponding duty or interest." *Brewer American Nat. Ins. Co.*, 636 F.2d 150, 154 (6th Cir. 1980). Kentucky case law "has routinely applied this common-interest application of a qualified privilege to the employment context." *Toler v. Süd-Chemie, Inc.*, 458 S.W.3d 276, 283 (Ky. 2014) (internal quotations

10

omitted). Qualified privileges, however, "must be exercised in a reasonable manner and for a proper purpose. The immunity is forfeited if the defendant steps outside the scope of the privilege or abuses the occasion." *Stringer*, 151 S.W.3d at 797. Abuse of the qualified privilege can occur by:

> (1) the publisher's knowledge or reckless disregard as to the falsity of the defamatory matter; (2) the publication of the defamatory matter for some improper purpose; (3) excessive publication; or (4) the publication of the defamatory matter not reasonably believed to be necessary to accomplish the purpose for which the occasion is privilege.

*Toler*, 458 S.W.3d at 284.

In his October 4, 2019 communication to the President of the University of Kentucky, Eli Capiluto, Dr. Kyrkanides allegedly asserted that "people go to jail" for altering documents in the manner Dr. Shehata did and characterized Dr. Shehata's actions as "illegal activity." [R. 77-5 at 451.] Dr. Kyrkanides did not identify Dr. Shehata by name in his communication. *Id.* Dr. Kyrkanides argued that his statement was made in the employment context because he was reporting "potential[] illegal activity by faculty members under his supervision" up the "chain of command." [R. 77-3 at 33.] Although Dr. Shehata does not dispute that Dr. Kyrkanides's communication was made in the employment context and is thus covered under the qualified privilege, he argues that Dr. Kyrkanides exhibited actual malice and "an obsession for punishing Dr. Cunningham," thereby implicating his co-Plaintiff Dr. Shehata. [R. 90 at 16.]

Upon review, the Court agrees with Dr. Shehata that it is unclear whether Dr. Kyrkanides published his statement for a proper purpose. Although Dr. Kyrkanides likely had a duty to report fraudulent activity by a subordinate to those superior to him, evidence in this matter suggests that Dr. Kyrkanides was "obsessed" with ensuring that Dr. Cunningham, and consequently Dr. Shehata, were punished. For example, Provost Blackwell testified that he intentionally excluded Dr. Kyrkanides from discussions regarding the punishment of Drs.

11

Cunningham and Shehata because he could not be objective and was "obsessed." [*See* R. 66-1 at 116.] Accordingly, it is more appropriate for a jury to determine whether Dr. Kyrkanides's communication exceeds the boundaries of the qualified privilege. The Court therefore declines to grant summary judgment in Dr. Kyrkanides's favor.

### III

So, where do these rulings leave Dr. Shehata's claims against Dr. Kyrkanides? First, Dr. Shehata's wage and hour claim remains, but only for work performed. Second, Dr. Shehata's defamation claim remains, but only for one statement made by Dr. Kyrkanides. Aside from these issues, the remainder of Dr. Shehata's claims against Dr. Kyrkanides have been resolved in favor of one party or the other. Accordingly, and the Court being otherwise sufficiently advised, it is hereby **ORDERED** as follows:

1. Dr. Kyrkanides's Motion for Summary Judgment [R. 77] is **GRANTED IN PART** and **DENIED IN PART**;

2. Counts II and III of Plaintiff's Amended Complaint [R. 55] are **DISMISSED** as to Dr. Kyrkanides;

3. The Court **DECLINES** to grant summary judgment in in favor of either party as to Counts V and VI of Plaintiff's Amended Complaint.

This the 21st day of October, 2021.



Gregory F. Van Tatenhove
United States District Judge